IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CALIBER HOME LOANS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-02298-M |
| | § | |
| LEE COVE, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions for Summary Judgment filed by Defendant Cardinal

Financial Company, Limited Partnership (ECF No. 153) and Defendant Lee Cove (ECF No.

156). For the reasons stated below, both Cardinal's and Cove's Motions are **GRANTED IN**

**PART AND DENIED IN PART**.

I.    **BACKGROUND**[1]

A.  **General Factual Background**

The facts related to this case are relatively extensive. The statement of material facts

section included in the response brief of Plaintiff Caliber Home Loans, Inc. (ECF No. 166) is

over 30 pages long. (ECF No. 166, pp. 14–46).[2] Accordingly, the Court provides here only a

general overview of the facts.

Caliber is an independent mortgage banker that during the relevant time frame originated,

processed, underwrote, closed and serviced mortgage loans through different channels, including

---

[1] To the extent the Court cites evidence to which a party has objected, the Court overrules that
objection.
[2] On November 26, 2024, the Court entered an Order (ECF No. 164) permitting Caliber to file a
single response brief to Defendants' Motions for Summary Judgment.

retail, wholesale, and consumer direct.  (ECF No. 168-1, p. 365, 18:2-12).[3]  Cardinal is a licensed mortgage services firm that competed with Caliber.  (ECF No. 116, p. 2, ¶ 2; p. 8, ¶ 23).

At the times relevant to this Order, Caliber's retail channel contained six divisions: Northeast, Southeast, Central, Mountain West, Pacific Northwest, and West Southwest.  (ECF No. 166, p. 14; ECF No. 168-2, p. 28).  The retail division sold residential mortgage services to borrowers.  (ECF No. 168-1, p. 344, 14:5-13; p. 365, 18:6-12).

Cove was the Divisional Vice President for the Southeast Division.  Brian Livingston—a non-party against whom Caliber has filed an arbitration—was the Divisional Vice President for the Mountain West Division.  (ECF No. 168-1, p. 25, 38:11-39:7; p. 41, 109:12-14; *see also* ECF No. 168-2, p. 28).  Livingston's division was created out of Cove's division after Cove ceded a large portion of his geographic region to keep Livingston at Caliber.  (ECF No. 168-1, pp. 24–25, 37:24-38:25).  Prior to becoming a Divisional Vice President, Livingston worked under Cove as a regional manager.  (ECF No. 168-1, p. 25, 38:23-25).  Cove and Livingston reported to James Hecht, the Head of Retail at Caliber, and directly supervised regional and area managers, who in turn supervised branch managers and loan originators and officers.  (ECF No. 168-1, p. 25, 39:8-15; p. 214, 34:2-7).[4]  Cove and Livingston had the power as Divisional Vice Presidents to decrease, to a degree, the rate a loan officer could offer to match a competitor's rate.  (*E.g.*, ECF No. 168-1, p. 28, 52:24-54:17).[5]

---

[3] Caliber was acquired by Newrez, LLC in August 2021, and Caliber's loan originators and other employees became known as Newrez employees on or about August 24, 2023.  (ECF No. 155-33, p. 5; ECF No. 155-34, p. 2; ECF No. 168-1, p. 364, 13:18-25; pp. 387–88, 76:2-77:3).

[4] Regional and area managers at Caliber had essentially the same role.  (*See* ECF No. 168-1, p. 51, 148:23-149:2; p. 94, 24:2-7).

[5] The evidence is unclear as to whether Cove and Livingston could unilaterally raise rates.  (*Compare* ECF No. 168-1, pp. 214–15, 36:4-22, *with* pp. 28–29, 52:24-54:10).

Regional managers Cove supervised included Kristi Canler, Chris Tabscott, and Kevin Cario.  (ECF No. 168-1, p. 25, 40:20-25; ECF No. 168-2, p. 28).  Regional managers Livingston supervised included Melonny Thompson and Cathy Gibb.  (ECF No. 168-1, p. 41, 108:18-22; ECF No. 168-2, p. 28).  Some regional managers were producing loan officers, meaning that they produced and originated loans individually, while other regional managers were not.  (*See, e.g.*, ECF No. 168-1, p. 68, 219:22-220:13; p. 135, 44:5-12; p. 253, 28:18-21).[6]

On December 9, 2014, Cove signed a Caliber Home Loans, Inc. Employee Confidentiality and Non-Solicitation Policy Attestation ("the 2014 Attestation").  (ECF No. 116-1, pp. 19–20).  The 2014 Attestation contains a "Confidential and Proprietary Information and Data" provision ("the Confidentiality Provision") and a "Non-Solicitation Provision."  (ECF No. 116-1, p. 20).  The Confidentiality Provision reads as follows:

> The Company has expended time, effort and money developing procedures, methods of doing business, specialized pricing, loyal investors, customers and vendors, and takes steps to protect these items and insure these are not available to the general public. All non-public confidential information relating to the Company's operations, procedures, methods, pricing, customers, employees, contractors, vendors, investors, lenders, financial condition, or results of operations, and any other non-public information relating to the Company acquired during employment with the Company does and shall constitute valuable, proprietary and confidential information of the Company, and shall not either during or after employment, be disclosed to any third party or used for one's own advantage or the advantage of any third party, except in connection with the performance of duties and responsibilities as an employee of the Company. The word "customers" should not be construed to include brokers or correspondent partners in the wholesale/correspondent sales channel. Non-public confidential information also includes information provided to the Company pursuant to an agreement which restricts the disclosure of information such as software, hardware, inventions and business information. Upon termination of employment with the Company,

---

[6] The distinction between individuals who produced and did not produce apparently applies to other roles as well.  (ECF No. 168-1, p. 78, 265:3-8).

> Employees [sic] must return the originals and any copies of confidential information provided by the Company.

(ECF No. 116-1, p. 20).  The Non-Solicitation Provision reads as follows:

> During employment and for a period of one year after employment with the Company ends, Employees [sic] will not, either directly, separately or in association with others, interfere with, impair or damage the Company's business by soliciting or encouraging any of the Company's employees with whom the Employee worked or who were in the same department of the Company, or causing others to solicit or encourage any of those employees to discontinue their employment with the Company.

(ECF No. 116-1, p. 20).  A number of other Caliber employees, like Livingston, signed attestations that include provisions similar to those quoted above.  (*See* ECF No. 116, pp. 22–23; ECF No. 168-1, pp. 420, 422, 427, 430, 432, 435, 438, 440, 443, 451; ECF No. 168-11, p. 279; *see also* ECF No. 154, p. 26; ECF No. 171, pp. 30–31).

Cove began at Caliber in 2013 as a Divisional Vice President, and his annual compensation reached as high as $5.1 million, with more typical years around $1.5 million.  (ECF No. 168-1, p. 24, 34:13-17; p. 46, 126:1-22; ECF No. 174-1, pp. 19–21).

Starting around June 2022, Cove, Livingston, and other Caliber employees began looking for different employment opportunities.  (*E.g.*, ECF No. 155-8, pp. 10–11, 65:15-66:2; ECF No. 168-1, p. 33, 76:7-16; p. 100, 58:13-59:4).  During 2022, mortgage rates had spiked upwards.  (ECF No. 154, p. 8).  This increase led to uncertainty in the mortgage market, and mortgage companies, including Caliber, implemented layoffs due to a lack of profitability from decreasing loan originations.  (*E.g.*, ECF No. 155-14, pp. 11–14, 49:12-52:1; ECF No. 168-1, p. 32, 73:3-12).  Cove and other Caliber employees testified that these circumstances led them to conclude that leaving Caliber was in their best interests.  (*E.g.*, ECF No. 168-1, p. 32, 73:18-20).  From 2021–22, Caliber lost approximately 2,000 employees, due to voluntary and involuntary departures.  (ECF No. 155-10, p. 20, 85:7-22).

Cove, Livingston, and some of their subordinates, including Kristi Canler, Chris Tabscott, Kevin Cario, and Melonny Thompson, met with other companies to discuss employment opportunities.  (*E.g.*, ECF No. 155-8, pp. 17–18, 86:24-87:7; ECF No. 168-1, p. 39, 99:10-23; pp. 41–43, 106:17-109:2, 113:21-114:6; p. 47, 130:14-132:12).  They met as a group or individually.  Sometimes after group meetings, those in attendance would collectively decide whether that company was a viable option.  (*E.g.*, ECF No. 168-1, p. 53, 155:20-156:7).  After individual meetings, those in attendance would often report to their colleagues at Caliber their thoughts about the other company.  (*E.g.*, ECF No. 155-13, pp. 16–17, 314:17-315:11; ECF No. 168-1, p. 40, 104:5-105:25; p. 47, 132:20-133:14).  Caliber employees formed impressions of other companies based solely on information reported to them from those individuals who communicated with a particular company.  (ECF No. 168-1, p. 110, 115:18-25).  The purpose of meeting with competitors was to give other companies the opportunity to present themselves to Caliber employees in attendance.  (*E.g.*, ECF No. 168-1, p. 52, 152:17-153:8).

Cove's and Livingston's first substantive meeting with Cardinal was in August 2022, when they met Brad Hoke, Cardinal's head of recruiting and SVP of Human Resources, for lunch in Florida.  (ECF No. 155-9, pp. 14–15, 54:5-55:11; ECF No. 168-1, pp. 59–61, 185:24-190:24; ECF No. 168-5, p. 11).  Hoke then coined the term "Project Coleslaw" to describe Cardinal's recruitment of Caliber employees, including Cove and Livingston.  (ECF No. 168-1, p. 301, 44:1-12; p. 305, 72:4-21; p. 321, 146:22-147:1).[7]  Cove and Livingston became aware of that term thereafter.  (ECF No. 168-1, p. 305, 72:4-21; *see also* pp. 75–76, 253:18-254:23).[8]

---

[7] Hoke refers to "Project Coleslaw" as a "code name," but Cove disagrees.  (*Compare* ECF No. 168-1, p. 301, 44:1-12, *with* ECF No. 168-1, p. 76, 254:7-13).
[8] It is unclear whether Cove and Livingston understood "Project Coleslaw" to apply to Cardinal's recruiting of other Caliber employees.

After the lunch, many events occurred. Hoke created a spreadsheet about various Caliber personnel in Cove's and Livingston's divisions. (*E.g.*, ECF No. 168-1, p. 311, 103:9-104:7; ECF No. 168-9, p. 91, Exhibit 77; *see also* ECF No. 168-1, p. 11, ¶ 76). Cove reported his thoughts on Cardinal to other Caliber employees. (ECF No. 168-1, p. 61, 191:13-192:11).[9] Cove and Livingston spoke with Cardinal's Chief Executive Officer, Nick Florez, and sent additional thoughts on Cardinal to other Caliber employees. (ECF No. 168-1, p. 61, 192:12-193:17; ECF No. 158, p. 83, 11:15-16). Some Caliber employees, including Cove and Livingston, traveled to Scottsdale, Arizona to meet Cardinal leaders at its headquarters. (*E.g.*, ECF No. 168-1, p. 61, 193:18-25; p. 117, 180:9-17).[10] Cardinal hosted "roadshow" recruiting events for Caliber employees in Miami, Florida; Aventura, Florida; Southlake, Texas; and Scottsdale, Arizona. (*E.g.*, ECF No. 168-1, p. 65, 208:21-23; pp. 67–68, 217:8-218:10, 221:22-24; p. 77, 260:21-24; p. 147, 147:1-6; p. 168, 34:5-10).

While some roadshows were larger and more formal than others, the general purpose of each was to give Cardinal the opportunity to recruit Caliber employees. (*E.g.*, ECF No. 168-1, p. 65, 207:20-208:10; p. 68, 218:1-6, 221:14-17; p. 75, 253:12-17; p. 77, 260:21-261:11). Nick Florez spoke at each roadshow about Cardinal and the opportunities it had to offer. (*E.g.*, ECF No. 168-1, p. 68, 218:1-6; p. 77, 260:21-261:11).

Cove testified that he was present at the Miami, Aventura, and Scottsdale roadshows. (ECF No. 168-1, pp. 67–69, 217:24-218:6, 221:22-223:21, 224:4-16; p. 76, 255:16-256:7). While Cove testified that he cannot recall whether he was at the Southlake roadshow, (ECF No. 168-1, p. 76, 255:12-15), others remember him being there. (ECF No. 168-1, p. 170, 41:2-5).

---

[9] The record suggests that Livingston also reported his thoughts on Cardinal to Caliber employees after this lunch. (ECF No. 168-1, p. 61, 192:7-11; p. 145, 108:15-17).
[10] Cardinal disputes that Cove organized this meeting. (ECF No. 170, p. 22).

Livingston was at the Miami, Southlake, and Scottsdale roadshows.  (ECF No. 168-1, pp. 67–69, 217:24-218:6, 221:22-224:16; p. 76, 256:1-21; p. 126, 244:1-21; p. 170, 41:2-5).

Preceding his resignation from Caliber, Cove sent to himself, and had his assistant, Tanya Dean, email him, spreadsheets about Caliber's employees and operations.  (*E.g.*, ECF No. 168-1, pp. 85–86, 290:17-292:20, 296:3-23).  (*See also* ECF No. 171, pp. 14–15).

On or around October 3, 2022, roughly 100 Caliber employees, including Cove and Livingston, submitted their resignations and joined Cardinal.  (*E.g.*, ECF No. 168-1, p. 299, 24:7-13; ECF No. 168-2, pp. 9–11, Exhibit 37).[11, 12]  This litigation ensued.

### B.  Procedural History

Caliber filed its Original Complaint on October 13, 2022.  (ECF No. 1).  It now proceeds on the Third Amended Complaint ("TAC").  (ECF No. 116).

The TAC asserts the following claims:  (1) breach of contract (against Cove); (2) tortious interference with existing contracts (against Cove and Cardinal); (3) breach of fiduciary duty/duty of loyalty (against Cove); (4) misappropriation of trade secrets and/or confidential business information under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1) ("DTSA"), and the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001

---

[11] Mariette Gillen, a Caliber branch manager, resigned and joined Cardinal prior to October 2022.  (ECF No. 168-1, p. 246, 64:10-65:14).  Some employees resigned and joined Cardinal closely after October 3, 2022.  (*E.g.*, ECF No. 168-1, p. 84, 286:12-24; ECF No. 168-2, pp. 9–11, Exhibit 37).  Other Caliber employees, such as Dante Puorro, regional manager in Caliber's Northeast division, resigned and joined Cardinal after October 2022.  (ECF No. 168-1, p. 68, 218:17-219:1; ECF No. 168-2, pp. 9–11, Exhibit 37; p. 28).

[12] The spreadsheet containing the names of Caliber employees who joined Cardinal in about October 2022 (ECF No. 168-2, pp. 9–11, Exhibit 37) contains a "Cardinal Start Date" column that lists October 1, 2022, as the start date for roughly 75 individuals, including those who resigned from Caliber on October 3, 2022.  (*E.g.*, ECF No. 168-1, p. 159, 210:18-211:2; p. 232, 153:18-20).  The Court does not consider this difference significant.

*et seq.* ("TUTSA") (against Cove and Cardinal); (5) knowing participation in a breach of fiduciary duty (against Cardinal); and (6) civil conspiracy (against Cove and Cardinal).

On December 16, 2024, Cardinal's and Cove's motions for summary judgment became ripe for determination.

## II.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden to prove that no genuine issue of material fact exists, but this does not require negating elements of the nonmoving party's case. *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). Instead, the moving party can meet its burden by identifying those portions of the pleadings, depositions, and other summary judgment evidence which demonstrate that the nonmoving party lacks evidence to support its claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986).

The burden then shifts to the nonmoving party to show that summary judgment is not warranted. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The nonmoving party must go beyond the pleadings and point to specific facts in affidavits, depositions, and other discovery that show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence will not defeat a summary judgment motion. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The court is to view all facts and inferences in the light most favorable to the nonmoving party. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003). However, the court "will not assume 'in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts.'" *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Little*, 37 F.3d at 1075).

### III.    ANALYSIS

#### A. Background

Cardinal and Cove argue that Caliber's TUTSA claim preempts its tort claims. (ECF No. 154, pp. 14–17; ECF No. 157, pp. 26–27, 32–34). If necessary, the Court will address each party's preemption argument in the subsection that addresses the claim to which the preemption argument is directed. However, the Court here sets forth the standards governing TUTSA preemption.

#### B. TUTSA Preemption Standards

TUTSA's preemption provision "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.007(a). TUTSA's preemption provision does not apply to contractual remedies or other civil claims not based upon the misappropriation of a trade secret. TEX. CIV. PRAC. & REM. CODE 134A.007(b)(1-2). Although there is some debate surrounding this question, Texas district courts have largely concluded that tortious interference with contract claims can be preempted by TUTSA. *Avenu Insights & Analytics, LLC v. Azavar Gov't Sols., Inc.*, 6:18-CV-00422-JDK-KNM, 2023 WL 3035363, at *3 (E.D. Tex. Feb. 24, 2023) (compiling cases).

A common law claim is preempted by TUTSA "[w]hen the gravamen of [the] common law claim duplicates a TUTSA claim." *Title Source, Inc. v. HouseCanary, Inc.*, 612 S.W.3d 517, 533 (Tex. App.—San Antonio 2010, pet. denied) (citation omitted).  In other words, "[a] claim is not preempted if the plaintiff is able to show the claim is based on facts unrelated to the misappropriation of the trade secret." *AMID, Inc. v. Medic Alert Found. U.S., Inc.*, 241 F. Supp. 3d 788, 825 (S.D. Tex. 2017) (citation and quotation marks omitted).

Courts differ on whether TUTSA preemption extends to confidential business information that is not a trade secret.  *Compare Topstone Commc'ns, Inc. v. Xu*, 729 F. Supp. 3d 701, 708 (S.D. Tex. 2024) (TUTSA preemption applies only to trade secrets), *and DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 923 (S.D. Tex. 2019), *with Stress Eng'g Servs., Inc. v. Olson*, H-21-3210, 2022 WL 4086574, at *7 (S.D. Tex. Aug. 4, 2022), *recommendation adopted*, 2022 WL 4084433 (S.D. Tex. Sept. 6, 2022) (TUTSA preemption applies to confidential business information that is not a trade secret), *and Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2018 WL 315753, at *3 (W.D. Tex. Jan. 5, 2018).  The basis for the finding that preemption applies only to trade secrets is that "'the plain language of . . . TUTSA's preemption provision' cannot 'be read to preempt civil remedies for the misappropriation of information that is not a trade secret.'" *Topstone*, 729 F. Supp. 3d at 708 (quoting *DHI Grp.*, 397 F. Supp. 3d at 923).  The contrary conclusion, that TUTSA preemption applies to confidential information, is based on the premise that allowing "multiple theories of relief for this same underlying harm would be to read the preemption provision too narrowly." *Embarcadero*, *supra*, at *3.

"'[M]ost district courts in Texas hold that if a plaintiff's tort claim is premised on the same factual allegations as its claim for trade secret misappropriation, the claim is preempted by

TUTSA.'" *ASG Chem. Holdings, LLC v. Bisley Int'l, LLC*, H-23-4333, 2024 WL 5036568, at *8 (S.D. Tex. Nov. 18, 2024) (quoting *Recif Res., LLC v. Juniper Cap. Advisors, LP*, No. H-19-2953, 2020 WL 6748049, at *13 (S.D. Tex. Nov. 17, 2020)). Courts have analyzed a claim of TUTSA preemption by focusing on whether the facts are the same, without determining whether the confidential information in question constitutes a trade secret. *See, e.g.*, *Embarcadero*, *supra*, at *4 ("The fact that some of the confidential information taken may not fit the statutory definition of trade secret does not change the outcome [of TUTSA preemption applying]."). This Court's analysis of Cardinal's and Cove's TUTSA preemption arguments will therefore turn predominantly on whether "the facts relied on to support the [non-TUTSA claims] differ from those supporting the TUTSA claim." *AMID*, 241 F. Supp. 3d at 826 (citation omitted).

### C. Cardinal's Global Issues: Causation and Damages

Cardinal takes two positions that extend across the claims brought against it.

#### 1. <u>Causation</u>

Cardinal urges that Caliber cannot show that Cardinal wrongfully caused every employee in its damages model to leave Caliber. (ECF No. 154, pp. 28–29; *see also* ECF No. 170, pp. 11–13). Cardinal argues that summary judgment should be granted for each individual about whom Caliber lacks evidence of this causation, which it asserts applies to most of the individuals in the damages model.

Cardinal bases its causation argument on three primary contentions. First, Cardinal argues that Caliber deposed only some of the individuals included in its damages model and assumes causation for the remainder. Second, Cardinal argues that Caliber cannot show causation for most of the individuals whom it deposed because these individuals testified that they were planning to leave Caliber before interacting with Cardinal. Third, Cardinal contends

that Caliber cannot show causation for lower-level employees who left Caliber and joined Cardinal, as these employees were recruited by Caliber leaders who had already planned to leave Caliber, not by Cardinal itself.  Cardinal cites authority only for the general proposition that Caliber must furnish evidence of causation.  (ECF No. 170, pp. 11–12 (citing *Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022))).

Beginning with Cardinal's argument that not all defecting Caliber employees were deposed, when read in the light most favorable to the non-moving party, the evidence establishes a genuine issue of fact as to whether Cardinal's actions proximately caused Caliber employees to leave Caliber.  Cardinal hosted roadshows with the express goal of recruiting Caliber employees, (*e.g.*, ECF No. 168-1, pp. 67–68, 217:24-218:6; p. 75, 253:12-17), and roughly 100 Caliber employees left Caliber to join Cardinal thereafter, (*e.g.*, ECF No. 168-1, pp. 6–7, ¶ 36; ECF No. 168-2, p. 10, Exhibit 37), including individuals present at a roadshow.  (ECF No. 168-1, p. 68, 218:1-219:7; p. 169, 40:16-18; p. 190, 43:2-17; p. 329, 226:1-13).  Ex-Caliber employees testified about the relevance of the roadshows to their decision to leave Caliber and join Cardinal, and said that they had not been interested in leaving Caliber until they heard about Cardinal.  (ECF No. 168-1, p. 175, 111:8-16; p. 194, 99:5-15; p. 205, 149:1-20).  The timing of the roadshows, the attendance of Caliber employees at them, the communication with senior Caliber employees, including Cove and Livingston, about the Cardinal opportunities, and the move of Caliber employees to Cardinal constitute circumstantial evidence that Cardinal caused Caliber damages, in the form of lost profits, from the solicitation and hiring of Caliber employees through the efforts of Cove and Livingston.  *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 289 (5th Cir. 2007) (quoting *Havner v. E-Z Mart Stores, Inc.*, 825

S.W.2d 456, 459 (Tex. 1992), that "[c]ircumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation" (quotation marks omitted)).

As for those individuals who stated that they were already planning to leave Caliber before being recruited by Cardinal, they left Caliber and joined Cardinal only after being recruited by Cardinal.  A reasonable jury could conclude that Cardinal's actions proximately caused individuals to *actually leave* Caliber and join Cardinal, even if they were already in the process of considering other employment.  *Cf. Homeland Exp., LLC v. Seale*, 420 S.W.3d 145, 149 (Tex. App.—El Paso 2012, no pet.) ("[W]e are mindful that there may be more than one proximate cause of a plaintiff's injuries and that the issue of proximate cause is usually a question of fact to be resolved by a jury." (citation omitted)).  Cardinal's argument is that a party could only be liable for causing an individual to leave his or her current employer if that individual had not already thought about leaving that employer.  That argument is overly broad.

Cardinal admits that many lower-level employees left Caliber and "followed their leaders" to Cardinal.  They did so only after their leaders were recruited by Cardinal.  (ECF No. 154, p. 29; *see also* ECF No. 168-1, p. 52, 151:20-152:11).  *See Swanner v. United States*, 406 F.2d 716, 718 (5th Cir. 1969) ("Alert avoidance of the classical fallacy of post hoc, ergo propter hoc does not require rejection of common sense inferences.").  A good example is Sean Ferguson, a loan officer at Caliber.  He testified that other Caliber employees recruited him to join Cardinal.  However, he attended the Southlake roadshow and that could have been a proximate cause of his departure from Caliber, since he thought Cardinal gave an impressive presentation there.  (ECF No. 168-1, p. 190, 43:2-17; p. 194, 99:5-15).  Similarly, Teresa Murphy, a lower-level manager at Caliber, testified that Caliber employees recruited her to join Cardinal, but she attended the Southlake roadshow.  (ECF No. 168-1, pp. 168–69, 34:5-10,

36:14-16, 40:16-41:12).[13]  A reasonable jury could find there to be a chain of proximate

causation between Cardinal's actions and the decision of employees like Ferguson and Murphy

to leave Caliber.

There is a genuine issue as to whether Cardinal's actions proximately caused Caliber's

damages resulting from the departure of its employees to Cardinal.  *See Navigant*, 508 F.3d at

289 ("There need not, however, be direct and positive proof, as the jury may infer proximate

cause from the circumstances surrounding the event." (quoting *Mosley v. Excel Corp.*, 109 F.3d

1006, 1009 (5th Cir. 1997) (citation and quotation marks omitted))).

  2. <u>Damages</u>

Cardinal's second global issue is that "Caliber cannot recover lost profits for the time

after it ceased loan operations on August 24, 2023."  (ECF No. 154, p. 30; *see also* ECF No. 170,

pp. 10–11).  Cardinal bases this contention on the fact that "it is undisputed that Caliber did not

exist as an operating entity after that time and Caliber provides no justification for receiving 'lost

profits' damages after it stopped operating."  (ECF No. 170, pp. 10–11).  Based on the evidence

submitted, it is inappropriate for the Court to grant summary judgment on Cardinal's argument

concerning damages that took place after August 24, 2023.  The Court does not find in the record

evidence of the details of the Newrez agreement, including whether Newrez is a dba or whether

Newrez succeeded to any Caliber claims.  *See supra*, p. 2 n.3.  The Court will again consider

damages in connection with Cardinal's motion to exclude the testimony of Brett Margolin,

Ph.D., asserting his opinion "claims lost profits for periods long after Caliber ceased operations."

(ECF No. 176, p. 17).

---

[13] Teresa Murphy's testimony is unclear on what her title was at Caliber, as she referred to herself as both a "sales manager" and a "lending manager."  (ECF No. 168-1, p. 166, 19:20-23).

Cove makes similar arguments about causation and damages, but he makes these arguments in the context of particular claims brought against him rather than universally. (*See, e.g.*, ECF No. 157, pp. 33, 35; ECF No. 171, pp. 20–23, 29–33). For the same reasons as those set forth above, the Court finds that Cove's arguments regarding causation do not support summary judgment. To the extent the Court has more to say on Cove's causation arguments, it will do so in the relevant subsections below.

**D.  Breach of Contract Claim (Cove)**

Caliber's breach of contract claim against Cove focuses on the Non-Solicitation Provision and the Confidentiality Provision. (ECF No. 116, pp. 31–34).

To prove a claim for breach of contract under Texas law, a party must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 351 (Tex. App. 2001—Houston [1st Dist.], no pet.)).

1.  <u>Non-Solicitation Provision</u>

Cove argues, among other things, that this Court should grant his motion because the Court previously ruled that the Non-Solicitation Provision is unenforceable. (ECF No. 157, pp. 17–20 (citing ECF No. 150); *see also* ECF No. 171, pp. 10–14). Caliber responds that the Court should find that the Non-Solicitation Provision is an enforceable agreement either because it is

15

not subject to § 15.50 of the Texas Business and Commerce Code or, in the alternative, contains

reasonable restrictions such as those § 15.50 allows.  (ECF No. 166, pp. 58–62).[14]

§ 15.50(a) of the Texas Business and Commerce Code states, in relevant part:

> [A] covenant not to compete is enforceable if it is ancillary to or
> part of an otherwise enforceable agreement at the time the
> agreement is made to the extent that it contains limitations as to
> time, geographical area, and scope of activity to be restrained that
> are reasonable and do not impose a greater restraint than is
> necessary to protect the goodwill or other business interest of the
> promisee.

In its October 15, 2024, Order, which the Court incorporates herein by reference, the

Court found that the Non-Solicitation Provision is subject to § 15.50 and contains unreasonably

broad restrictions.  (ECF No. 150, pp. 4–8).  The Court found, as a result, that the Non-

Solicitation Provision is unenforceable.

The arguments before the Court do not support it reconsidering its previous ruling.  As

the Court ruled in its October 15 Order, non-competes and non-solicitation provisions are

governed by "the same legal dictates" and the enforceability of these "restraint[s] of trade is a

question of law."  *Intertek Testing Servs. NA, Inc. v. Tiemann*, NO. 4:23-CV-00425, 2024 WL

4008097, at *3 (S.D. Tex. Aug. 29, 2024) (citation omitted).  *See also U.S. Risk, LLC v. Hagger*,

650 F. Supp. 3d 520, 528–29 (N.D. Tex. 2023).  Additionally, the evidence Caliber cites shows

that Caliber did not require a nationwide non-solicitation provision applying to individuals with

whom Cove never worked to protect its legitimate business interest.  (*See* ECF No. 150, pp. 6–

7).  *See Hagger*, 650 F. Supp. 3d at 528–29 (finding that the "employee nonsolicitation

provision" contained unreasonable restrictions because it "would . . . prohibit [the defendant]

---

[14] Caliber does so even though the Court stated in the October 15, 2024, Order that "[n]o further
briefing will be permitted on whether the non-solicitation provision is unreasonable as written."
(ECF No. 150, pp. 4–8).

from soliciting hundreds of [the plaintiff's] employees with whom he had no contact during his period of employment" and that "[the plaintiff] *could have protected its legitimate business interests by prohibiting solicitation of a limited subset of employees with whom [the defendant] had worked*." (emphasis added) (citing *Ally Fin., Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038, at *8 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.))).

As the Court confirmed in its October 15 Order, this Court normally has a duty to reform an agreement deemed to contain unreasonably broad restrictions. TEX. BUS. & COM. CODE § 15.51(c). *See also Young Innovations, Inc. v. Dental Health Prods., Inc.*, No. 4:18-10726, 2019 WL 13211666, at *12 n.23 (S.D. Tex. Jan. 2, 2019). However, the Court "may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief." § 15.51(c).

Here, the Non-Solicitation Provision has expired and Caliber seeks only monetary damages, not injunctive relief. *See Hagger*, 650 F. Supp. 3d at 528 ("USR can no longer seek injunctive relief in this case, as the covenants at issue expired . . . . USR seeks only monetary damages, and therefore reformation of the terms is unnecessary here."). (*See also* ECF No. 150, pp. 7–8 (discussing the futility of reforming the unenforceable, expired Non-Solicitation Provision)). This Court therefore will not reform the unreasonably broad Non-Solicitation Provision.

Because the Non-Solicitation Provision is unenforceable and thus cannot serve as the basis for Caliber's breach of contract claim, Cove's motion for summary judgment on Caliber's breach of contract claim with regard to the Non-Solicitation Provision is **GRANTED**. *See, e.g.*, *Hagger*, 650 F. Supp. 3d at 530; *Intertek*, *supra*, at *4.

17

### 2.  Confidentiality Provision

Cove does not argue that the Confidentiality Provision is unenforceable.  Instead, he argues that Caliber lacks evidence "identifying what alleged confidential information was taken" and "establishing that any such information is in fact confidential (as opposed to publicly available)."  (ECF No. 157, pp. 24–25).  Cove also contends that Caliber lacks evidence that Cove kept and used any allegedly confidential information after he left Caliber.  (ECF No. 157, p. 25; *see also* ECF No. 171, pp. 14–16).

Caliber responds to Cove's contentions, asserting that (1) "Cove breached his confidentiality obligations by taking confidential information with him for use at Cardinal" and (2) "Cove breached this obligation of confidentiality by virtue of his communications with competitors about Caliber employees."  (ECF No. 166, p. 63).  Although Caliber cites portions of the record in an attempt to support the first contention, it fails to cite anything in support of the latter.  (ECF No. 166, p. 63).  Because mere conclusory allegations cannot raise a genuine issue of material fact and overcome a motion for summary judgment, the Court's analysis will focus on Caliber's first assertion and the evidence presented in support of it.  *See, e.g.*, *Little*, 37 F.3d at 1075; *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923–24 (N.D. Tex. 2009).[15]

---

[15] To the extent Caliber relies on other evidence, it is the party's burden to direct the Court to evidence that supports its contentions in opposition to a motion for summary judgment.  *See, e.g.*, *Holmes v. N. Tex. Health Care Laundry Coop. Ass'n*, 304 F. Supp. 3d 525, 539 (N.D. Tex. 2018).  None of the evidence mentioned in Caliber's response details (a) which pieces of information that Cove allegedly communicated to competitors fall under the purview of the Confidentiality Provision, (*see, e.g.*, ECF No. 166, pp. 21–22 (only discussing exhibits that contain information that does not fall under the terms of the Confidentiality Provision, *i.e.*, Exhibits 105, 107, and 108)), or (b) that Cove actually communicated to competitors information that falls within the Confidentiality Provision, (*see, e.g.*, ECF No. 166, pp. 42–44, 63 (only discussing allegedly confidential information in the context of Cove sending himself or having Tanya Dean send him this information while they were still employees at Caliber)).  *See infra*, pp. 37–41 (discussing the lack of evidence supporting the "use" element of the misappropriation of trade secrets claims against Cove and Cardinal).

The evidence Caliber cites to prove that Cove breached the Confidentiality Provision by taking confidential information with him to, and for use at, Cardinal consists of Cove's deposition testimony, emails between Cove and Tanya Dean, and emails Cove sent himself. (ECF No. 166, p. 63 (citing ECF No. 168-1, pp. 85–88; ECF No. 168-2, pp. 2–4, 6–8, 33–34, 36–37)).  Attached to the emails were the spreadsheets containing the information that Caliber contends in its TUTSA claims are the allegedly misappropriated trade secrets.

Cove stated in his deposition that some information about which he was being examined was "public information" and that "[a]nybody can get these reports."  (*See* ECF No. 168-1, p. 85, 291:13-292:2; p. 87, 298:22-300:17).  Because the Confidentiality Provision by its own terms only applies to "non-public" information, any public information that Cove received cannot serve as the basis for a claim that Cove breached the Confidentiality Provision.

Cove acknowledged in his deposition, however, that some information contained in the spreadsheets was non-public information.  (ECF No. 168-1, pp. 87–88, 300:23-301:5, 303:12-305:16).  This information includes the total gross profit margin, net margin, fee revenue, concessions and overall margin associated with the loan officers in Cove's division, along with information about Caliber's internal operations, like employee IDs and cost centers.

This evidence does not support a finding that Cove disclosed this information "to any third party or used [it] for [his] own advantage or the advantage of any third party," which is what the Confidentiality Provision requires.  Russell Smith, Caliber's Chief Operating Officer, conceded that he was not presented with any proof, evidence, or emails from anybody at Caliber that showed that Cove or Livingston took confidential information with them when they left Caliber.  (ECF No. 158, p. 60, 106:18-24).  (*See also* ECF No. 155-8, pp. 28–29, 319:9-14, 319:25-320:9).

Caliber seemingly asks the Court to conclude that Cove must have used the non-public information he took for either his or Cardinal's benefit, or disclosed it to Cardinal, because the subject emails were sent to him only days before his departure from Caliber. That conclusion is insupportable. The timing alone is insufficient to constitute legitimate circumstantial evidence of wrongful use or disclosure of the material. *See GE Betz, Inc. v. Moffitt-Johnson*, 885 F.3d 318, 325–27 (5th Cir. 2018); *infra*, pp. 37–41. Indeed, Cove testified that he received these types of reports as often as "every month" and that he had been engaged in the practice of sending himself emails with this type of information for "years." (ECF No. 168-1, pp. 85–86, 292:16-17, 294:6-7, 296:22-23). (*See also* ECF No. 168-1, p. 86, 296:24-297:9).

The other evidence Caliber cites in an attempt to create a genuine issue as to Cove's alleged breach of the Confidentiality Provision also falls short. For example, Caliber highlights that Cove was assured that Nick Florez would "have [his] back" if litigation ensued as a result of Cove's move from Caliber to Cardinal, (ECF No. 168-1, p. 67, 215:13-20), and that "Cardinal agree[d] to advance [Cove] defense fees and costs in connection with [Cove's] defense" of any such litigation. (ECF No. 168-3, p. 74).[16] Caliber asks the Court to infer that Cove must have sent Caliber's confidential information to Cardinal because Cardinal supported Cove in his move from Caliber to Cardinal and agreed to assist him with litigation expenses. *See Harris v. Wiggins*, NO. 1:18-CV-523, 2020 WL 6821014, at *2 (E.D. Tex. May 3, 2020) ("[T]he court's obligation to draw reasonable inferences 'does not extend so far as to allow a wholly unreasonable inference or one which amounts to mere speculation and conjecture.'" (quoting

---

[16] Caliber construes the agreement in question as one that would "indemnify Cove for litigation expenses" even though the agreement explicitly states that the advances of litigation expenses "are not to be construed as, nor are they, an agreement to indemnify [the Employee] against claims made against the Employee by their former employer." (ECF No. 166, p. 63; ECF No. 168-3, p. 74).

*Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984)) (quotation marks and citation omitted)). The Court finds that there is no genuine issue of fact that Cove breached the Confidentiality Provision. Therefore, Cove's motion for summary judgment on the breach of contract claim with respect to the Confidentiality Provision is **GRANTED**.

### E. Tortious Interference with Existing Contracts (Cove and Cardinal)

Caliber's tortious interference claims against Cove and Cardinal focus on both the Non-Solicitation and Confidentiality Provisions. (ECF No. 116, pp. 40–43). In addition to Cove's and Livingston's contracts, Caliber pled that it has similar contracts with other employees with which Cove and Cardinal allegedly interfered. (ECF No. 116, pp. 41–42).

To prove a claim for tortious interference with existing contracts, a party must show: "'(1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage, and (4) actual damage or loss occurred.'" *Orthoflex, Inc. v. ThermoTek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2012 WL 2864510, at *5 (N.D. Tex. July 12, 2012) (quoting *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 664 (Tex. 1990)). *See also Polyflow, LLC v. Specialty RTP, LLC*, 993 F.3d 295, 305 (5th Cir. 2021).

#### 1. Non-Solicitation Provision

A claim for tortious interference with existing contracts cannot be predicated on an unenforceable contract. *E.g.*, *Orthoflex*, *supra*, at *5–*6. Because the Non-Solicitation Provision is unenforceable, Caliber's and Cove's motions for summary judgment on the tortious interference claims are **GRANTED** to the extent these claims rely on the Non-Solicitation Provision. *See Compass Bank v. Tex. Cmty. Bank*, No. DR-09-CV-056-AML-CW, 2010 WL 11506744, at *4 (W.D. Tex. Apr. 26, 2010); *Orthoflex*, *supra*, at *6 ("Because ThermoTek seeks

damages only for actions that would have occurred before reformation, its tortious interference with contractual relations claim must be dismissed.").[17]

     2.  Confidentiality Provision

     The record is devoid of evidence that creates a genuine issue of fact as to whether Cardinal and Cove interfered with the Confidentiality Provision. There is nothing that shows, for example, that Cardinal or Cove encouraged Caliber employees to disclose any confidential business information of Caliber. Brad Hoke testified that he asked neither Cove nor Livingston to give him any confidential information about the individuals at Caliber who Cardinal was recruiting. (ECF No. 155-9, p. 40, 281:4-19). He also testified that Cove never sent him or any member of his team "any information on production volume, salary, or loans for the Caliber employees that [Hoke and his team] ultimately recruited to Cardinal." (ECF No. 155-9, p. 40, 281:20-24). Similarly, Nick Florez testified about steps Cardinal takes to ensure that new employees do not breach their confidentiality obligations to their previous employers. (*See, e.g.*, ECF No. 168-1, pp. 276–77, 76:24-78:1).[18]

---

[17] Caliber has not directed the Court to a non-solicitation provision that substantially differs from the Non-Solicitation Provision quoted above. (*See* ECF No. 168-1, pp. 420, 422, 427, 430, 432, 435, 438, 440, 443, 451; ECF No. 168-11, pp. 279–80; *see also* ECF No. 154, p. 26; ECF No. 171, pp. 30–31). Because "[j]udges are not like pigs, hunting for truffles buried in briefs," the Court only considers those agreements to which Caliber points the Court. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). *See also N. Tex. Health Care Laundry Coop.*, 304 F. Supp. 3d at 539 ("Rule 56 does not impose a duty on the court to sift through the record in search of evidence to support the nonmovant's opposition to the motion for summary judgment." (citation and quotation marks omitted)). Because these other provisions are substantially similar to the Non-Solicitation Provision, they are also unenforceable and therefore cannot serve as the basis for Caliber's tortious interference claims. *See, e.g.*, *Compass Bank*, *supra*, at *4.

[18] Caliber's response also clarifies that its tortious interference claims are predicated on the Non-Solicitation Provision and not the Confidentiality Provision, as the evidence Caliber cites in support of this claim pertains to the Non-Solicitation Provision. For example, the title of the section of Caliber's response directed to the tortious interference claims states that the Court should deny the motions for summary judgment because Caliber "has presented substantial material evidence demonstrating that Defendants knowingly caused employees to violate the

There is no genuine issue of material fact as to the tortious interference claims to the extent these claims are predicated on the Confidentiality Provision.  The tortious interference claims cannot be predicated on the Non-Solicitation Provision because that agreement is unenforceable.  Therefore, Cardinal's and Cove's motions for summary judgment on the tortious interference claims are **GRANTED**.[19]

### F.  Breach of Fiduciary Duty/Duty of Loyalty (Cove)

Caliber's breach of fiduciary duty claim against Cove rests primarily on the allegations that Cove acted in concert with Livingston and Cardinal to solicit Caliber's employees, sabotage and destroy Caliber's business operations, and provide false information about Caliber to Caliber's employees in an attempt to convince those employees to leave Caliber and join Cardinal.  (ECF No. 116, pp. 38–40).

"Under Texas law, an employee may prepare to go into competition with his employer before resigning without breaching [his] fiduciary duty, but may not act for the employee's future interest at the expense of the employer by a course of conduct designed to hurt the employer."  *Trueblue, Inc. v. DeRuby*, No. 3:18-cv-0192-M, 2018 WL 1784523, at *2 (N.D. Tex. Apr. 13, 2018) (citing *Johnson v. Brewer & Pritchard, PC*, 73 S.W.3d 193, 199 (Tex. 2002)).  Soliciting the departure of other employees while still working for an employer can support a

---

*contractual non-solicitation obligations owed to Caliber*."  (ECF No. 166, p. 71 (emphasis added) (capitalization cleaned up)).  Caliber also states in this same section that "Cove and Cardinal tortiously interfered with Caliber's contracts with its employees requiring loyalty during employment and *prohibiting the solicitation of certain Caliber's employees* [sic]."  (ECF No. 166, p. 72 (emphasis added)).  Further, in the subsection in which Caliber details its evidence on the proximate cause element of its tortious interference claims, which it titles "Cardinal's interference proximately caused Caliber's *loss of employees*," Caliber contends that the Court could "easily infer[] that Caliber suffered damages as a direct and proximate result of Cove and Cardinal's actions *because scores of the solicited Caliber employees resigned to join Cardinal*."  (ECF No. 166, p. 74 (emphasis added)).  In short, Caliber's evidence concerning the tortious interference claims relates to the Non-Solicitation Provision.
[19] Given these findings, the Court does not reach Cardinal's and Cove's arguments that Caliber's tortious interference claims are preempted by TUTSA.

finding of a breach of fiduciary duty. *Navigant*, 508 F.3d at 284 ("'The employee may not . . . solicit the departure of other employees while still working for his employer . . . .'" (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2003, no pet.))).

A claim for breach of fiduciary duty requires: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Id.* at 283 (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)). *See also Jones v. Wells Fargo Bank, N.A.*, 858 F.3d 927, 932–33 (5th Cir. 2017).

    1.  <u>Whether There Is a Genuine Issue of Fact as to a Breach or Resulting Injury</u>

Cove does not contend in his motion for summary judgment that he did not have a fiduciary relationship with Caliber, so the Court assumes for the purpose of this analysis that Cove and Caliber had such a relationship. Regarding the second and third elements, Cove contends that there is no evidence that he solicited or lured away Caliber employees or made false, misleading or disparaging comments about Caliber or that Caliber lost profits or that he gained a benefit as a result of the alleged breach of fiduciary duty. (ECF No. 157, pp. 32–33; ECF No. 171, pp. 27–30).

Caliber responds that Cove breached his fiduciary duty because he made false, misleading and intentionally disparaging statements about the viability of Caliber's retail department and instructed employees to keep the plans secret. (ECF No. 166, pp. 50–51). Caliber also alleges that Cove solicited Caliber employees away from Caliber in breach of his fiduciary duty. (ECF No. 166, pp. 48–57).

There is evidence before the Court that creates a genuine issue of fact as to whether Cove breached his fiduciary duty to Caliber and whether Caliber was injured or Cove benefited as a result. While Cove and other Caliber employees discussing potential employment opportunities outside of Caliber is not enough to find that Cove breached his fiduciary duty, Caliber points to evidence that Cove was engaged in behaviors that harmed Caliber in breach of his fiduciary duty. For example, evidence supports the allegation that Cove contacted a number of people about leaving Caliber. (*See* ECF No. 168-1, p. 243, 42:23-43:19). There is also evidence that Caliber employees thought about leaving Caliber only after talking to Cove, (ECF No. 168-1, p. 231, 146:5-18), and that their decision to leave was influenced by Cove and his presence at a roadshow. (ECF No. 168-1, p. 205, 149:6-20). Murphy testified that Cove directly solicited her away from Caliber and to Cardinal. (ECF No. 168-1, p. 180, 129:1-130:19). Gibb testified that she solicited Caliber employees to go with her to Cardinal "under [Cove's and Livingston's] encouragement." (ECF No. 168-1, p. 234, 163:20-25). *Compare GE Betz, Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 693 (S.D. Tex. 2014), *aff'd in relevant part sub nom.*, *GE Betz, Inc.*, 885 F.3d at 318 ("[The employee] testified that [the defendant] did not tell him anything about [the defendant-entity] beyond the fact that she was going there. . . . Nothing [in the employee's] testimony introduces a fact issue regarding whether [the defendant] solicited [the employee's] departure from [the plaintiff] in breach of [the defendant's] fiduciary duty.").

Testimony supports the contention that Cove was working for the benefit of Cardinal in an effort to solicit Caliber employees. For example, at least one Caliber branch manager, Phil Thompson, texted Cove—not Cardinal—about the time, location and attire for a roadshow. (ECF No. 168-1, p. 75, 251:11-253:11; ECF No. 168-11, pp. 6–7). Canler also testified that Cove knew of every action she took with regard to Cardinal, including, for example, when she

was modifying projected profit and loss statements for Caliber offices based on expected headcount with Cardinal, and sharing that information with Cardinal, and setting up product sessions for Caliber employees to meet with Cardinal. (ECF No. 168-1, pp. 123–24, 233:11-234:5; p. 128, 250:22-253:20; p. 130, 258:23-259:3; ECF No. 168-5, pp. 15–21, 30). Additionally, testimony indicates that Cove played a large role in coordinating the time and manner of the October 3, 2022, resignations. (ECF No. 168-1, p. 228, 101:4-101:10). In response to his telling Cove that he was "leaning heavily" toward another company, Cario testified that Cove said that Cario should consider listening to Cardinal prior to signing anything with another company. (ECF No. 168-1, p. 263, 82:12-18, 83:18-84:4).

There is also evidence that Cove's actions may have been influenced by the potential windfall he would receive from Cardinal's "attempt[] to launch a new division with [Cove] and [Livingston]" "as part of Project Coleslaw." (ECF No. 168-1, p. 338, 267:1-9). The connection between Cove's actions and this potential windfall is strengthened by the fact that Brad Hoke stated that Cardinal "needed to recruit many individuals" if this new division was to manifest. (ECF No. 168-1, p. 338, 267:1-9). In fact, there is evidence that Cove had a financial incentive, whether direct or indirect, to hire people into his division at Cardinal within the first 120 days he was there. (ECF No. 168-1, pp. 380–81, 181:5-184:1; ECF No. 168-5, p. 43). *See Navigant*, 508 F.3d at 284 ("'Of course, such a person may not act for his future interests at the expense of his employer by using the employer's . . . employees for personal gain or by a course of conduct designed to hurt the employer.'" (quoting *Brewer & Pritchard*, 73 S.W.3d at 202)).

There is also deposition testimony that creates a genuine issue of fact as to whether Cove made false, misleading, or intentionally disparaging comments about the future viability of Caliber's retail department in an effort to convince Caliber employees to leave. (ECF No. 168-1,

26

p. 218, 51:12-52:4; p. 239–40, 22:15-23:25, 26:2-23).  There is further evidence that Cove told

certain employees to keep plans about departure from Caliber secret, including by using

ephemeral, encrypted third-party messaging apps in an effort to conceal and destroy

communications about employees leaving Caliber for Cardinal.  (ECF No. 168-1, p. 220, 58:14-

59:11).

 These facts, viewed holistically, demonstrate a genuine issue of fact as to whether Cove

breached his fiduciary duty and whether this breach caused Caliber harm and/or benefited Cove.

  2. <u>Whether the Breach of Fiduciary Duty Claim Is Preempted by TUTSA</u>

 TUTSA preemption focuses on whether the non-TUTSA claims are based on the same

facts that underpin the TUTSA claim.  *Supra*, pp. 9–11.  Caliber's breach of fiduciary duty claim

against Cove focuses primarily on Cove allegedly soliciting Caliber employees through the

means described above, instructing other Caliber employees that the plans be kept secret, and

setting up the roadshows to solicit Caliber employees.  (ECF No. 116, pp. 38–40; ECF No. 166,

pp. 48–51).

 While some of these allegations and the resulting damages might overlap to a degree with

the facts that support Caliber's TUTSA claim against Cove, "the Court . . . doubts the Texas

legislature intended for TUTSA to become a plaintiff's sole remedy whenever the allegations

somehow touch on business information or trade secrets."  *Philips N. Am. LLC v. Image Tech.*

*Consulting, LLC*, NO. 3:22-CV-0147-B, 2022 WL 17168372, at *5 (N.D. Tex. Nov. 21, 2022).

Put differently, the facts at issue show that Caliber's breach of fiduciary duty claim is not a mere

duplicate of its TUTSA claim.  *See, e.g.*, *Trueblue, supra*, at *2 (finding that the breach of

fiduciary duty claim was not preempted by TUTSA).  Caliber's breach of fiduciary duty claim

against Cove is not preempted by its TUTSA claim.  Cove's motion for summary judgment on this claim is therefore **DENIED**.

### G.  Knowing Participation in a Breach of Fiduciary Duty (Cardinal)

Caliber's knowing participation claim rests primarily on the allegations that Cardinal provided Cove and Livingston with assistance and encouragement to breach their fiduciary duties by, among other things, soliciting Caliber employees to leave Caliber and join Cardinal. (ECF No. 116, pp. 43–44).

"'Knowing participation in breach of fiduciary duty is a derivative claim, requiring an underlying breach of fiduciary duty, in which the defendant knowingly participates.'" *Dockside Marine, LLC v. Walker*, NO. 09-23-00047-CV, 2024 WL 3220404, at *8 (Tex. App.—Beaumont June 27, 2024, no pet.) (quoting *Straehla v. Al Glob. Servs., LLC*, 619 S.W.3d 795, 804 (Tex. App.—San Antonio 2020, pet. denied)).  Under Texas law, "[w]hen a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *Kastner v. Jenkens & Gilchrist, PC*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.) (citation omitted).

A claim for knowing participation in a breach of fiduciary duty requires:  "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Tex. Newspapers, LP v. Wooten*, 59 S.W.3d 717, 721–22 (Tex. App. 2001—Austin, pet. denied)). "[A] plaintiff may prevail on a knowing participation claim with circumstantial evidence alone." *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384-N, 2022 WL 179609, at *12 (N.D. Tex. Jan. 20, 2022) (citing *Franklin D. Azar & Assocs., PC v. Bryant*, No.:4:17-cv-00418-ALM-KPJ, 2019 WL 5390172, at *4 (E.D. Tex. July 30, 2019)).

To inform whether a defendant knowingly participated, courts consider whether a defendant "contributed to, induced, or facilitated the other party's breach of its fiduciary duty." *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 573 (N.D. Tex. 2024).

       1. <u>Whether There Is a Genuine Issue as to Cardinal's Knowing Participation</u>

Because Cardinal does not dispute that Cove and Livingston owed Caliber a fiduciary duty and that Cardinal was aware of these duties, (ECF No. 170, pp. 21–22), the Court's analysis turns on whether there is a genuine issue of fact as to whether Cardinal knowingly participated in a breach of fiduciary duty by Cove or Livingston. To this end, Cardinal argues that "Caliber has produced no evidence that Cardinal was aware that it was participating in a breach of fiduciary duty by Cove or Livingston." (ECF No. 154, p. 25). For example, Cardinal contends that "[t]here is no evidence showing that anyone at Cardinal asked any Caliber employee to recruit other 'wrongfully recruited' Caliber employees." (ECF No. 154, p. 25).

Caliber responds that Cardinal knowingly participated in Cove/Livingston's breach of fiduciary duty by hosting recruitment meetings, including the roadshows that Caliber contends Cove and Livingston helped organize. (ECF No. 166, pp. 65–67). Caliber also contends that Brad Hoke coordinated with Livingston to formulate employment offers for Caliber employees while Livingston was still a Caliber employee. (ECF No. 166, p. 66).[20]

The evidence Caliber cites creates a genuine issue of fact as to whether Cardinal knowingly participated in a breach of fiduciary duty by Livingston/Cove. Pertaining to

---

[20] Caliber's arguments pertaining to the knowing participation claim attempt to implicate the fiduciary duties of individuals other than Cove and Livingston. (*See, e.g.*, ECF No. 166, p. 65 ("There is abundant evidence of Cardinal's 'participation' in the fiduciary breaches of *Caliber's employees*." (emphasis added)). However, because the TAC pertaining to the knowing participation claim focuses only on Cardinal knowingly participating in a breach of fiduciary duty by Cove and Livingston, (*see* ECF No. 116, pp. 43–44, ¶¶ 179–80), the Court's analysis considers only evidence that Cardinal knew it was participating in a breach by Cove or Livingston. (*See* ECF No. 170, p. 21 n.7).

Livingston, there is evidence that Hoke worked alongside Livingston, while Livingston was still employed by Caliber, to formulate employment and compensation offers for at least 35 Caliber loan originators. (ECF No. 168-1, p. 228, 99:17-100:3, 100:9-25). Although it is disputed whether Livingston coordinated this meeting, it is undisputed there was a meeting in Arizona between Cardinal, Gibb, and Gillen. (ECF No. 168-1, p. 221, 72:2-6; p. 285, 183:4-7). In fact, Gibb testified that her first contact with Cardinal took place when she was coordinating with Cardinal about her visit to Arizona, which took place subsequent to her meeting with Cove and Livingston. (ECF No. 168-1, p. 222, 76:18-24, 77:11-18). A reasonable jury could find from the evidence that Cardinal contributed to Livingston's alleged effort to solicit Caliber employees away from Caliber.

There is also disputed evidence that Cove addressed and solicited the Caliber group at a roadshow. (*Compare* ECF No. 168-1, p. 170, 42:2-44:11, *and* p. 180, 129:8-130:25, *with* ECF No. 168-1, p. 76, 255:12-15, 256:22-257:14). (*See also* ECF No. 168-1, p. 171, 45:12-25). A reasonable jury could find that Cove speaking at a roadshow hosted by Cardinal showed that Cardinal was aiding Cove's solicitation efforts by providing him with a platform on which he could solicit Caliber employees from Caliber. *See Centennial Bank*, 717 F. Supp. at 573 (stating that "the standard knowing-participation case [is] where a defendant takes a specific action that *aids* the breach itself" (emphasis added) (citation omitted)). Cove also testified that Cardinal asked him whether he had a non-solicitation obligation to Caliber and that he informed Cardinal that he did. (ECF No. 168-1, pp. 89–90, 307:18-308:2, 313:2-4). This evidences a genuine issue as to whether Cardinal was on notice that its actions contributed to Cove and Livingston breaching their fiduciary duties to Caliber.

Cardinal contends that *its* recruiting team contacted 409 Caliber employees that it identified as recruits. (ECF No. 154, p. 12 (citing ECF No. 155-9, p. 33, 164:3-13)). Cardinal's phone records with Caliber employees, which Caliber cites as evidence to the contrary, create a genuine issue as to whether Cardinal contacted each individual it deemed a recruit, as there are fewer names on these phone records and a large number of the calls in those records took place after October 3, 2022. (ECF No. 166, p. 74 (citing ECF No. 168-10, pp. 36–48, Exhibit 84); *see also* ECF No. 168-1, p. 12, ¶ 83; ECF No. 168-1, p. 197, 109:7-12).

Since there is evidence in favor of a reasonable finding of actual awareness, this Court must conclude that there is a genuine issue of fact that precludes summary judgment. *Rotstain*, *supra*, at *12. Since there is evidence that Cove's and Livingston's actions constituted a breach of their fiduciary duties, there is also a genuine issue as to whether Cardinal knowingly participated in those breaches.

### 2. Whether the Knowing Participation Claim Is Preempted by TUTSA

The Court finds that TUTSA does not preempt this claim because it is based in part on facts unrelated to the misappropriation of confidential information or trade secrets. *See Trueblue*, *supra*, at *1–*2. These facts focus on the alleged solicitation of Caliber employees away from Caliber and Cardinal's awareness that it was participating in Cove's and Livingston's attempts to do so in violation of their fiduciary duties. *See supra*, pp. 29–31. The harm for which Caliber is seeking redress pertains to more than just a misappropriation of trade secrets or confidential information. The fact that the damages sought overlay across the claims does not support a finding of preemption.

Caliber's knowing participation claim is not preempted by TUTSA and summary judgment on that claim is **DENIED**. *See, e.g.*, *Philips N. Am.*, *supra*, at *5; *Title Source*, 612 S.W.3d at 533.

### H. Civil Conspiracy (Cove and Cardinal)

Caliber's civil conspiracy claim against Cove and Cardinal focuses on an alleged conspiracy in which Cove, Livingston, and Cardinal sought to misappropriate trade secrets and engage in unfair competition in an attempt to harm Caliber's business operations. (ECF No. 116, pp. 34–36). Caliber's allegations in support of its civil conspiracy claim also focus on Cardinal's recruitment meetings, the compensation offers Cardinal proposed to Caliber employees, and the confidential information Cove and Livingston allegedly took from Caliber. (ECF No. 116, pp. 34–36).

Civil conspiracy is "a derivative tort, meaning it is connected to the underlying tort and survives or fails alongside it." *Premier Elecs., LLC v. ADT, LLC*, No. 3:18-CV-2036-L, 2023 WL 3963832, at *11 (N.D. Tex. June 12, 2023) (citation and quotation marks omitted). "It is not the agreement itself, but an injury to the plaintiff resulting from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy." *Lesikar v. Rappeport*, 33 S.W.3d 282, 301–02 (Tex. App.—Texarkana 2000, pet. denied) (citation omitted).

To prove a claim for civil conspiracy, a party must show the following: "'(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.'" *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Like a knowing participation claim, "[a]

civil conspiracy can be established by circumstantial evidence." *Davis v. Cisneros*, 1:21-CV-565-RP, 2024 WL 4611218, at *26 (W.D. Tex. Aug. 13, 2024) (citation omitted).

   1. <u>Whether There Is a Genuine Issue as to Any of the Elements</u>

  Cardinal and Cove both argue the absence of a genuine issue of material fact as to all elements of a conspiracy except the first. (ECF No. 154, pp. 27–28; No. 157, pp. 27–29).[21]

  Caliber responds that "the conspiracy was to accomplish a lawful purpose (recruitment of multiple [d]ivisions of Caliber [r]etail employees to Cardinal) through unlawful means (breach of fiduciary duty, and tortious interference with non-solicitation agreements)." (ECF No. 166, p. 70). In support of this argument, Caliber contends that the following allegations, among others, demonstrate "overt acts to further the conspiracy": the creation of the Project Coleslaw codename; Cardinal's immediate creation of the "Caliber Home Loans_2022 spreadsheet" following the lunch between Hoke, Cove, and Livingston;[22] Cardinal hosting certain Caliber employees in Scottsdale; the roadshows; the joint effort of Hoke, Livingston and Gibb to formulate compensation offers for Caliber employees, while Livingston and Gibb were still employed by Caliber; and the joint mass registration date. (ECF No. 166, pp. 70–71). Caliber cites evidence to support each of these allegations. (*See* ECF No. 166, pp. 70–71 (citing, *e.g.*, ECF No. 168-1, pp. 62–63, 194:8-195:10; pp. 65–66, 209:12-210:10; pp. 75–76, 253:18-255:3; p. 228, 99:17-100:3, 100:9-25; p. 311, 103:9-104:7; ECF No. 168-2, pp. 9–11, Exhibit 37)).

---

[21] Cardinal and Cove also contend that no underlying tort supports a civil conspiracy claim. However, since the Court denies summary judgment on the breach of fiduciary duty claims, there is an underlying tort on which Caliber can maintain its civil conspiracy claims. *See supra*, pp. 27–28, 32. *See also Holden v. Holden*, 456 S.W.3d 642, 659 (Tex. App.—Tyler 2015, no pet.) ("[A] cause of action for conspiracy may be based on a breach of fiduciary duty." (citation omitted)).

[22] This spreadsheet includes details about Caliber personnel working in Cove's and Livingston's divisions. (*See* ECF No. 166, pp. 25–26; ECF No. 168-1, p. 11, ¶ 76 (describing Exhibit 77); ECF No. 168-9, p. 91, Exhibit 77).

The Court finds that the evidence cited above creates a genuine issue as to each of the disputed elements of the civil conspiracy claims, including whether Cardinal, Cove, and Livingston had a meeting of the minds to solicit Caliber employees in a breach of Cove's and Livingston's fiduciary duties and whether the alleged overt acts of solicitation resulted in harm to Caliber. *See, e.g.*, *Cisneros*, *supra*, at *26 ("The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." (citation and quotation marks omitted)). There is also evidence that Cardinal, Cove, and Livingston agreed to host recruiting meetings with the goal of soliciting Caliber employees to fill a new division at Cardinal that Cove and Livingston were to lead. (*See* ECF No. 168-1, p. 198, 114:12-20; p. 219, 54:19-55:12; p. 338, 267:1-9).[23]

### 2. Whether the Civil Conspiracy Claim Is Preempted by TUTSA

Cove and Cardinal argue that the civil conspiracy claims are preempted by TUTSA. (ECF No. 154, p. 14; ECF No. 157, pp. 26–27). For the same reasons stated in the sections concerning the breach of fiduciary duty and knowing participation claims, the civil conspiracy claim is not preempted by TUTSA because the gravamen of the conspiracy claims is distinct

---

[23] Cove contends that the Court should dismiss the civil conspiracy claim brought against him because Caliber did not plead breach of fiduciary duty as the underlying tort on which its civil conspiracy claims are based. (ECF No. 171, pp. 16–17). In support of that contention, Cove cites *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920 (Tex. App.—Dallas 2014, pet. denied). *W. Fork* itself cites *Wingert v. Devoll*, No. 03-09-00440-CV, 2010 WL 3271744, at *7 (Tex. App.—Austin Aug. 20, 2010, pet. denied), for the proposition that the claimant failing "to plead the underlying tort on which he relies" is a basis on which "the viability of a conspiracy claim can be defeated." *W. Fork*, 437 S.W.3d at 920. The court in *Wingert*, however, was focused on the fact that the plaintiff "did not plead [the claim of intentional interference with official duties] *independently of his conspiracy claim*." *Id.* at *7 (emphasis added) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). Here, the TAC contains the underlying torts. Cardinal concedes that "Caliber's civil conspiracy claim is premised on its claims for misappropriation of trade secrets . . ., *knowing participation in a breach of fiduciary duty*, and tortious interference with existing contracts." (ECF No. 154, p. 27 (citing ECF No. 116, ¶ 124) (emphasis added)).

from the misappropriation of trade secrets or confidential information.  Thus, Cardinal's and Cove's motions for summary judgment as to the civil conspiracy claims are **DENIED**.

## I. Misappropriation of Trade Secrets Under DTSA and TUTSA (Cove and Cardinal)

Caliber's misappropriation of trade secrets claims focus on allegations that Cove and Cardinal improperly obtained Caliber's trade secrets and used them to solicit Caliber employees to join Cardinal.  (ECF No. 116, pp. 36–38).  "Because the DTSA and TUTSA are both based on the Uniform Trade Secrets Act, a substantial number of provisions in the two statutes—including the definition of trade secret—are either identical or very similar in many respects."  *Pro Mineral, LLC v. Marietta*, No. 3:21-CV-02773-E, 2023 WL 2410884, at *2 (N.D. Tex. Mar. 8, 2023) (citation and quotation marks omitted).  Courts consider TUTSA and DTSA claims together.  *See Vest Safety Med. Servs., LLC v. Arbor Envtl., LLC*, No. 4:20-CV-0812, 2022 WL 2812195, at *6 (S.D. Tex. June 17, 2022), *recommendation adopted* 2022 WL 2806544 (S.D. Tex. July 18, 2022); *M-I LLC v. Q'Max Sols., Inc.*, No. H-18-1099, 2019 WL 3565104, at *3 (S.D. Tex. Aug. 6, 2019).

Misappropriation of trade secrets under either statute requires proof of:  (1) the existence of trade secrets; (2) misappropriation; and (3) use without consent.  *Vest Safety*, *supra*, at *6 (citing *StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 344 (E.D. Tex. 2019)).  *Accord Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015).

Under both statutes, a trade secret includes:

> all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored,

> compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6); *see also* 18 U.S.C. § 1839(3). "'Whether a trade secret exists is a question of fact.'" *Q'Max*, *supra*, at \*4 (quoting *GlobeRanger Corp. v. Software AG USA, Inc.*, 836 F.3d 477, 492 (5th Cir. 2016)).

Misappropriation means that the alleged trade secret was obtained through breach of a confidential relationship or other improper means. *Vest Safety*, *supra*, at \*9 (citing *Q'Max, supra*, at \*3). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." TEX. CIV. PRAC. & REM. CODE § 134A.002(2). *See also Vest Safety*, *supra*, at \*9. Additionally, there must be evidence that the allegedly misappropriated trade secret was actually used. *Providence Title Co. v. Truly Title, Inc.*, 732 F. Supp. 3d 656, 666–67 (E.D. Tex. 2024) (compiling cases). *See also GE Betz*, 885 F.3d at 325–26.

The alleged trade secrets are contained in the spreadsheets Cove acquired prior to his departure from Caliber. (ECF No. 166, pp. 76–77). They generally contain this information:

(1) a compensation spreadsheet for Caliber employees in the Southeast Division (ECF No. 168-2, pp. 2–4, 6–8, Exhibits 35–36);

(2) a production volume spreadsheet for Caliber loan consultants in the Southeast division (ECF No. 168-2, pp. 33–34, Exhibit 44);

(3) a spreadsheet about unit and volume information for loan consultants in the MidSouth and South divisions (ECF No. 168-2, pp. 36–37, Exhibit 45); and

(4) a spreadsheet containing information about branch volume and profitability information (ECF No. 168-2, pp. 39, 41–43, Exhibits 46–47).

(ECF No. 154, pp. 19–22; ECF No. 166, pp. 76–77; ECF No. 171, pp. 24–26).[24]

1. Cove

Assuming without deciding that there is a genuine issue as to whether Cove misappropriated alleged trade secrets, the Court considers whether there is a genuine issue of fact as to whether Cove used any of the alleged trade secrets. Cove argues that Caliber has not presented evidence that he used the information in question and that Caliber asks the Court to rely only on the assumption that Cove and Cardinal must have used the information because Cove received it just days before his resignation from Caliber. (ECF No. 157, p. 31).

Caliber argues: (1) no legitimate reason exists as to why Cove transmitted the spreadsheets immediately before leaving Caliber, other than to benefit Cardinal and himself;[25] (2) while at Caliber, Cove "often" sought from competitors the type of information contained in the spreadsheets; (3) Cardinal hired loan officers whose information was included in the spreadsheets; and (4) Cove continued to solicit Caliber employees after he joined Cardinal. (ECF No. 166, pp. 79–81).

*GE Betz* is instructive. In that case,

> the individual defendant resigned from her role as an executive with the plaintiff, GE, to join the entity defendant in a newly-

---

[24] The full, native versions of the spreadsheets were provided to the Court separately on a USB flash drive. The ECF pages cited are the pages that correspond with the exhibits of those spreadsheets as they were filed in PDF form on ECF.

[25] Caliber briefs this issue in the misappropriation section, but the Court considers it as part of its use analysis. (ECF No. 166, p. 79).

established role that would directly compete with GE, a position she accepted while still working for GE. 885 F.3d at 322. She lied to GE about the duties in her new role, denying that she would be competing against it. *Id.* In the weeks leading up to her departure from GE, the individual defendant engaged in highly suspicious activity on her computer. *Id.* Computer monitoring software generated a report showing that someone using the individual defendant's computer (presumably the individual defendant) downloaded over 27,000 files to an external hard drive mere days after the defendant announced her resignation. *Id.* Those files contained GE's client information. *Id.* at 323. And on her last day at GE, the individual defendant sent GE's most recent financial data to her email address associated with the entity defendant. *Id.* at 326. Within a year of the individual defendant's employment with the entity defendant, the entity defendant had acquired many of GE's customers—many of which were customers with GE while the individual defendant worked there. *Id.*

*Providence Title*, 732 F. Supp. 3d at 668 (summarizing the facts of *GE Betz*).

The Fifth Circuit in *GE Betz* affirmed the district court's granting of summary judgment to the defendant, reasoning that there was insufficient evidence to establish use. *GE Betz*, 885 F.3d at 325–27. The Fifth Circuit focused on two points relevant here. First, the Fifth Circuit highlighted the lack of "evidence of actual use" and that a court may not "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action." *Id.* at 327 (noting that the defendant "allegedly obtain[ing] the trade secrets through a download of data and emails to herself on the eve of her departure" was insufficient to create a genuine issue of fact as to use (cleaned up)). Second, the Fifth Circuit emphasized that the fact that a competitor is successful in acquiring clients from a plaintiff does not demonstrate use. *Id.* at 326–27. *See also CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 263 (5th Cir. 2022) ("[The plaintiff] contends that [the defendant] could never have succeeded without [the plaintiff's] data, claiming that the 'use' of this data can reasonably be inferred from [the

defendant's] results.  This inference is insufficient to support a finding that [the defendant] use [the plaintiff's] trade secrets." (emphasis and quotation marks omitted)).

Caliber's allegations are insufficient to create a genuine issue of fact as to whether Cove used the allegedly misappropriated trade secrets.  The allegations that Cove continued to solicit Caliber employees after he joined Cardinal, that Cardinal hired loan officers whose information was included in the spreadsheets, and that Cove sent himself the information right before his departure are the types of evidence courts, such as *GE Betz*, have considered insufficient to create a genuine issue of fact as to the use element.[26]

The same can be said for Caliber's contentions that "[i]t is easily inferable that Cove sent the spreadsheets to [Tanya] Dean in the days before he resigned so she could print copies for him to bring to Cardinal" and "Cove joined Cardinal the very next day as a Division leader responsible for managing the very same [loan officers] whose information was contained in the spreadsheets."  (ECF No. 166, pp. 79–80).  The evidence is that Cove blind copied himself on emails "regularly," and had Tanya Dean print "all [of his] documents . . . every month" while he worked at Caliber.  (*See* ECF No. 168-1, p. 84, 289:23-25; p. 86, 296:16-23).

Cove's practice of seeking "competitive intelligence" also cannot serve as a basis on which the Court can find that there is a genuine issue of fact as to whether Cove used Caliber's alleged trade secrets.  In response to being asked in his deposition "what does [competitive intel] mean," Cove stated that he "would meet with [his] peers and owners of other companies, share intel, learn about them."  (ECF No. 168-1, p. 31, 64:17-20).  Nowhere in the deposition testimony that Caliber cites to support its competitive intelligence contention does Cove say that

---

[26] If, as Caliber contends, one of the spreadsheets is a "compilation of earnings for *all* Caliber employees" who worked in that division, then the spreadsheets would necessarily include those employees from that division who resigned.  (ECF No. 166, p. 76 (emphasis in original)).

the "intel" he would share or seek included "employee compensation, loan histories, margins, revenue, concessions, [or] identit[ies] of borrowers." (ECF No. 166, pp. 80–81 (citing ECF No. 168-1, p. 31, 64:10-25)).

Cove had a duty to keep secret any trade secrets he obtained as a Caliber employee, but Caliber did not present evidence that Cove breached his duty of secrecy. *See Auto Wax Co., Inc. v. Byrd*, 599 S.W.2d 110, 111 (Tex. App.—Dallas 1980, no writ). Cove testified that he "shredded" or "gave [the documents] back" before he left Caliber. (ECF No. 168-1, p. 86, 296:24-297:9). Caliber does not provide evidence to the contrary. (*See also* ECF No. 115-10, p. 15, 28:12-22).

For the foregoing reasons, there is not a genuine issue as to the use element of the misappropriation claim against Cove. Cove's motion for summary judgment on the misappropriation claim is therefore **GRANTED**.

    2. <u>Cardinal</u>

Cardinal contends that "the unrebutted testimony in this case . . . is that nobody gave Cardinal any of Caliber's confidential information, and that Cardinal never used any Caliber confidential information [sic] in recruiting Caliber employees." (ECF No. 154, p. 24). Cardinal cites the deposition testimony of Cove, Brad Hoke, Kristi Canler, Cathy Gibb, and Robert Johnson, the corporate designee of Caliber, to support its argument. (ECF No. 154, pp. 23–24).

The contentions and evidence Caliber invokes in support of its claim that Cardinal used Caliber's trade secrets are the same as the evidence and contentions it invoked against Cove. (ECF No. 166, pp. 79–82). Unique to Cardinal, however, is Caliber's contention that Cardinal can be held liable under the doctrine of respondeat superior for Cove's alleged use of its

misappropriated trade secrets, if Cove used this information for Cardinal's benefit. (ECF No. 166, p. 81).

There is no genuine issue as to whether Cardinal or Cove used Caliber's trade secrets to recruit Caliber employees. Caliber fails to present any evidence that establishes that Cardinal even acquired the spreadsheets. In fact, the evidence is to the contrary. Cove testified that he did not share the information in the spreadsheets—or any of Caliber's confidential information— with anyone at Cardinal, (ECF No. 155-8, pp. 28–29, 319:9-14, 319:25-320:9), and Brad Hoke testified that he neither asked for nor received any of Caliber's confidential information. (ECF No. 155-9, p. 40, 281:4-24; ECF No. 155-29, p. 62). Caliber fails to present evidence rebutting the deposition testimony Cardinal cites evidencing that no Caliber employee shared the information with Cardinal. (*See* ECF No. 154, pp. 23–24 (citing ECF No. 155-13, pp. 12–13, 225:12-14, 299:22-25; p. 15, 310:2-5; ECF No. 155-18, p. 12, 166:12-21)). A lack of evidence that Cardinal possessed the spreadsheets necessarily leads to the conclusion that Cardinal did not use the spreadsheets.

Caliber's respondeat superior argument also fails since there is no evidence that Cove used Caliber's alleged trade secrets for his or Cardinal's benefit.

For the reasons stated above, Cardinal's motion for summary judgment on the misappropriation claim is **GRANTED**.

IV.    **CONCLUSION**

For the reasons stated above, Cove's and Cardinal's Motions for Summary Judgment are **GRANTED IN PART AND DENIED IN PART**. The Court **GRANTS** Cove's motion on Caliber's breach of contract, tortious interference with existing contracts, and misappropriation of trade secrets claims and Cardinal's motion on the tortious interference with existing contracts

and misappropriation of trade secrets claims.  The Court **DENIES** Cove's motion on Caliber's breach of fiduciary duty and civil conspiracy claims and Cardinal's motion on the knowing participation in a breach of fiduciary duty and civil conspiracy claims.

       **SO ORDERED**.

       January 10, 2025.


                                 BARBARA M. G. LYNN
                                 SENIOR UNITED STATES DISTRICT JUDGE